FILED
2012 Mar-05  PM 03:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

JOHN G. GRANT, JR.,                )
                                   )
     Movant/Defendant,           )
                                   )
v.                                 )      2:08-cv-8025-VEH-PWG
                                   )      (2:04-cr-0398-VEH-PWG)
                                   )
UNITED STATES OF AMERICA,          )
                                   )
     Respondent                  )

## MEMORANDUM OPINION

In this action, John C. Grant, *pro se*, moves to vacate, set aside, or correct, his federal sentence pursuant to 28 U.S.C. § 2255. (Civ. Doc.[1] 1). After being convicted at trial on six counts of making false reports to a federally insured bank, in violation of 18 U.S.C. § 1014 and § 2, Grant was sentenced to a term of 24 months imprisonment followed by 36 months of supervised release. Upon consideration, the court finds that Grant's § 2255 motion is due to be denied.

## I.   BACKGROUND

On September 29, 2004, Grant was indicted as follows: six counts of knowingly and willfully making false reports to a federally insured bank, a violation

---

[1]Citations to "Civ. Doc(s) ___" are to the document numbers assigned by the clerk to the pleadings and other papers in the court file of this § 2255 "civil" case, 2:08-cv-8025-VEH-PWG, as reflected on the docket sheet.

of 18 U.S.C. § 1014 and § 2 (counts one through six); one count of bank fraud, a violation of 18 U.S.C. § 1344 and § 2 (count seven); and one count of conspiracy, a violation of 18 U.S.C. § 371 (count eight). (Crim. Doc.[2] 1). On January 4, 2005, the case went to trial. The evidence showed as follows.

At the time relevant to his convictions, Grant was the President and principal owner of Southern Pride Contractors, Inc. ("SPC"). Sometime in 1999, SPC began a banking relationship with Covenant Bank in Leeds, Alabama. (Trial Trans.[3] at 20). In April of 2001, Grant signed a "commitment letter" on behalf of SPC which set forth the terms of a loan agreement between SPC and Covenant Bank. (*Id.* at 25-26). The agreement granted SPC a line of credit up to $500,000. (*Id.* at 26). SPC could, however, only draw up to 80% of the value of its accounts receivable, not to exceed the credit limit of $500,000. (*Id.* at 27). The agreement additionally required SPC to send the bank "an aging accounts receivable report" on a monthly basis. (*Id.* at 63-65). This allowed the bank to ensure that the amount of credit extended did not exceed 80% of the accounts receivable. In August or September of 2002, SPC began efforts to obtain a substantial contract with the Anniston Army Depot. (Trial Trans.

---

[2]Citations to "Crim. Doc(s) ___" are to the document numbers assigned by the clerk to the pleadings and other papers in the court file of the underlying "criminal" case, 2:04-cr-0398-VEH-PWG, as reflected on the docket sheet.

[3]Citations to "Trial Trans. ___" are to the page of the trial transcript. Volume I of the trial transcript is Crim. Doc. 50. Volume II is Crim. Doc. 51.

at 104, 105).  SPC sought to raise its line of credit with Covenant Bank to $800,000.
(*Id.* at 105).  To do so, SPC had to demonstrate, because of the 80% requirement of
the loan agreement, that it had accounts receivable in the amount of $1 million.  (*Id.*
at 107).  Because SPC could not meet that requirement, Michael Crisp, SPC's
Comptroller, began to falsify the monthly reports under the direction of Grant.[4]  (*Id.*
at 106, 119).  The dates of the reports and the corresponding amounts are as follows:

1. September 24, 2002 – $1,046,700

2. October 31, 2002 – $1,089,000

3. December 6, 2002 – $985,750

4. December 31, 2002 – $889,000

5. April 1, 2003 – $1,109,550

6. May 13, 2003 – $1,112,000

(Crim. Doc. 1 at 2; Trial Trans. at 32-38).

On each of these occasions, the true current outstanding account receivables
were substantially less than what was reported to the bank.  (Trial Trans. at 110-11).
For example, the reports included accounts receivable from contracts that had already
been completed and some that SPC had bid on, but had not been awarded.  According
to Crisp, when the first false report was filed, SPC's true accounts receivable would

---

[4]Crisp pled guilty to his role in the matter and testified against Grant.

3

have been approximately $300,000 or $400,000. (*Id.* at 110). And, after that, the amount "would definitely have gone down because [SPC] didn't have as many jobs going." (*Id.* at 111). During the time period of the fraud, the deposits in SPC's checking account with Covenant Bank ranged from $129,596.77 to $451,631.65. By the time SPC's true financial condition was discovered, however, those monies had been depleted. As a result, the bank suffered a principal loss on the line of credit in the amount of $481,945.38.

At the close of the government's case, the court granted the government's motion to dismiss the bank fraud charge in count seven of the indictment. (*See* unnumbered minute entries in Crim. case dated 1/5/05 and 1/6/05). On January 6, 2005, the jury returned a verdict finding Grant guilty on counts one through six of making false reports to the bank but acquitting him on the conspiracy charge of count 8. (Crim. Doc. 15).

At the time of Grant's indictment and trial, the United States Sentencing Guidelines ("USSG" or the "Guidelines") were mandatory in their application. Under the Guidelines, a defendant's sentence was determined in part based upon findings to be made by the trial judge, by a preponderance of the evidence, as to the amount of the loss resulting from the defendant's offense conduct. *See* USSG 2B1.1; *United States v. Wilson*, 993 F.3d 214, 217 (11th Cir. 1993). Six days after the jury returned

its verdict against Grant, but before he was sentenced, the Supreme Court handed down its decision in *United States v. Booker*, 543 U.S. 220 (2005), which held that the Guidelines violate a defendant's Sixth Amendment right to a jury trial to the extent that they required a district court to increase a sentence based upon any fact (other than the fact of a prior conviction) found by the judge at sentencing, where such fact is neither admitted by the defendant nor found by a jury beyond a reasonable doubt.  As a result of *Booker*, the Guidelines became advisory rather than mandatory.  *See* 543 U.S. at 245; *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  However, the district judge presiding at Grant's trial, the Honorable Robert B. Propst, charged the jury to make a "special finding" beyond a reasonable doubt as to the amount of the loss suffered by Covenant Bank as a result of Grant's offense conduct. (*See* Crim. Doc. 15 at 1).  The jury held that the amount of such loss was $350,000. (*Id.*)

At Grant's initial sentencing, Grant objected, in relevant part to this opinion, to the loss amount set out in the Presentence Investigation Report ($481,945.38), and to the impact the loss amount had on his offense level.  (*See* Crim. Doc. 17, *passim*). Grant specifically argued

> The Defendant exercised his right to a trial of this matter before a jury of his peers. On January 6, 2005, the jury returned a verdict finding the defendant guilty of six counts of aiding and abetting in the making of a

false reports to a Federally Insured Institution under 18 U.S.C. § 1014
& 2. Additionally, the jury made a specific finding of loss in the amount
of $350,000.00. This PSR only makes reference to the alleged loss
which was listed in the indictment $481,945.38, no where does it even
mention the $350,000.00. The Defendant has an expressed right to
allow the jury to make a finding on the amount of loss incurred by a
victim. Therefore, the Defendant objects to the finding that the amount
of the loss was in excess of $400,000.00.

***[5]

With these premises considered[,] the Defendant asserts that his base
level should be calculated at 6. Because the amount of determined loss
was over $200,000.00 but less than $400,000.00 the offense level is
increased by 12. Additionally, the Defendant has a criminal history of
zero. Therefore, based on a total offense level of 18 and a criminal
history category of I, the advisory guideline range for imprisonment
should be 27-33 months not 41-51 months.

(*Id.*).

The government responded to Grant's objections. (*See* Crim. Doc. 17). The

government argued:

In light of *Booker*, such demanding findings which require proof beyond
a reasonable doubt are no longer required. The court in considering the
advisory nature of the Guidelines is free once more to apply the less
demanding standard of proof for sentencing enhancements, proof by a
preponderance of the evidence.

The United States submits that the court in this case is not bound by the
jury's determination regarding what the loss amount was, but should,
instead, make its independent finding on this issue, using the
preponderance of the evidence standard of proof.

---

[5]Grant also objected to the PSR enhancement for perjury.

6

(*Id.*) (internal citation omitted).

At Grant's initial sentencing hearing, the trial judge, in attempting to determine the loss amount under the now-advisory Guidelines, rejected both the jury's special finding as to the amount ($350,000) and the amount stated in the pre-sentence report ($481,945.38).  (Crim. Doc. 45 ("Sent. Trans. I") at 18).  The court also rejected Grant's proposed figure of approximately $20,000.  (Sent. Trans. I at 17).  Instead, the trial judge, although without explanation, found the loss to be $50,000.  (*Id.* at 18).  Based on that finding, the trial judge found the offense level to be 14, and it further found the criminal history category to be 1, resulting in an advisory Guideline range of 15 to 21 months.  (*Id.* at 22).  On April 25, 2005, the trial judge imposed a sentence of five months imprisonment and five months of home detention with electronic monitoring on each count, to be served concurrently.  (*Id.* at 38-39; Crim. Doc. 22).

Grant appealed his convictions, and the government cross-appealed the sentence.  The United States Court of Appeals for the Eleventh Circuit denied Grant's appeal and affirmed his convictions, but reversed the sentence based on the government's cross-appeal.  *United States v. Grant*, 211 Fed. App'x 889, 2006 WL 3749545 (11th Cir. Dec. 21, 2006) ("*Grant I*").  (Crim. Doc. 62).  Specifically, the Eleventh Circuit agreed with the government's argument that the trial judge's

calculation of the amount of the loss for sentencing purposes at $50,000 was "clearly erroneous" and required a remand for re-sentencing because "the district court failed to provide any factual basis whatsoever for its ultimate loss calculation." *Grant I*, 211 Fed. App'x at 898.

On remand, the trial judge recused himself, and the case was reassigned to the undersigned judge, who presided over the re-sentencing. (Crim. Doc. 60). On Grant's motion, the court precluded the government from offering any additional evidence as to the amount of the loss. (Transcript from Second Sentencing Hearing ("Sent. Trans. II"), Crim. Doc. 68, at 5, 23). Rather, after reviewing the materials in the case file, the court adopted the jury's finding that the loss from the offense was $350,000, concluding that it was sufficiently supported by the evidence already in the file. (Sent. Trans. II at 26). Based on that finding, the total adjusted Guideline level became 20 which, when combined with a criminal history category of 1, resulted in an advisory Guideline range of 33 to 41 months. (*Id.*) Although the court found no basis to depart from the Guidelines, the court did vary from the advisory range, sentencing Grant to 24 months on each of the six counts, to be served concurrently, with an additional 36 months of supervised release following the prison term. (Sent. Trans. II at 43-44; Crim. Doc. 65). Grant again appealed, challenging his sentence, but the Eleventh Circuit affirmed. *United States v. Grant*, 311 Fed. App'x 186, 2008

WL 44481 (11th Cir. Jan. 3, 2008).  (Crim. Doc. 78).

Grant now moves to vacate, set aside, or correct his sentence pursuant to §
2255. (Civ. Doc. 1 at 1-8 ("Sec. 2255 Motion" or "Sec. 2255 Mot.")).  In his motion,
he raises one claim of substantive error, as well as several claims alleging that his
attorneys were constitutionally ineffective, both at trial and on appeal.  (§ 2255 Mot.
¶ 12).  As to his substantive claim, he argues that he "is entitled to have his sentence
corrected . . . due to an intervening change of law." (*See* "Memorandum of Law" in
Support of § 2255 Motion, Civ. Doc. 1 at 9-35 ("Dft. Memo") at 6[6])).  Regarding
counsel's performance, Grant asserts that counsel was ineffective for: (1) failing to
argue on appeal that his sentence had to be reviewed "under an abuse-of-discretion
standard"; (2) failing to "properly argue that the initial advisory guideline range had
been correctly determined"; (3) failing to inform Grant that "the government could
crossappeal his sentence if he appealed his conviction"; (4) failing to "interview,
investigate, and present evidence in support of [Grant]'s defense"; (5) failing "argue
and request a third-party guilt jury instruction"; and (6) failing to "allow [Grant] to
submit post-trial evidence of his actual innocence." (Dft. Memo at 9-22).  The
government has filed a response in opposition to Grant's § 2255 Motion and Memo

---

[6]Citations to "Dft. Memo" are to the page number at the bottom center of the Memo
itself.  Thus, for example, Dft. Memo at 6 corresponds to page 15 of the 71 pages that comprise
Civ. Doc. 1.

(Doc. 4 ("Gov't Brief")), and Grant has filed a reply thereto.  (Doc. 6 ("Dft. Reply")).

Accordingly, Grant's § 2255 motion is ripe for disposition.

## I.  DISCUSSION

### A.  Ground One - "Change in the Law" as to the Appellate Standard of Review

"Ground One" of Grant's motion contains his sole freestanding claim, *i.e.*, one

not based on ineffective assistance of counsel.  In that claim, Grant contends that he

is entitled to have his sentence reduced pursuant to § 2255 because a Supreme Court

decision issued following his first appeal, *Gall v. United States*, 552 U.S. 38 (2007),

establishes that the Eleventh Circuit used an improper standard of review when it

granted the government's cross-appeal and remanded his case for re-sentencing,

which resulted in a longer sentence.[7]  In *Gall*, the Supreme Court held that under the

post-*Booker*, advisory Guidelines regime, an appellate court must review the sentence

imposed under an "abuse-of-discretion" standard regardless of whether that sentence

---

[7]Upon Grant's re-sentencing, Grant was ordered to surrender to federal authorities by August 15, 2007.  (Crim. Doc. 65).  His motion for bond pending his second direct appeal was denied.  (Crim. Doc. 75). It thus appears that Grant has completed his 24-month prison sentence imposed on remand.  A post-conviction claim that attacks only the length or validity of a sentence that has been fully served, but does not contest the validity of an underlying criminal conviction, is moot.  *See Lane v. Williams*, 455 U.S. 624, 631 (1982); *North Carolina v. Rice*, 404 U.S. 244, 248 (1971).  However, it appears that Grant has not yet completed his 36-month term of supervised release that commenced following his 24-month prison sentence.  As such, Grant is still "in custody" for habeas purposes, and his motion for post-conviction relief is not moot.  *See Jones v. United States*, 2011 WL 4425315, *3 (11th Cir. Sept. 23, 2011); *United States v. Brown*, 117 F.3d 471, 475 (11th Cir. 1997).

is inside or outside the Guidelines range.  552 U.S. at 51.  The Court further explained:

> [The district court] must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C. §] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.  Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.

*Gall*, 552 U.S. at 51.  Grant emphasizes that the Eleventh Circuit instead reviewed the district court's determination that the amount of the loss was $50,000 under a "clearly erroneous" standard of review.  *See Grant I*, 211 Fed. App'x at 895-98.  As such, Grant contends, he "is entitled to have his sentence corrected to reflect the judgment originally imposed."  (Dft. Memo at 7).

The government suggests that this claim is procedurally barred because it was not argued on direct appeal.  Nonetheless, the government appears willing to assume for present purposes that it is not defaulted, and the undersigned will do likewise. Even so, § 2255 is not a vehicle affording relief on this claim, which is not founded upon on an alleged constitutional violation.  An error of law not rising to a constitutional violation does not provide a basis for post-conviction relief under §

11

2255 unless it constitutes a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998) (quoting *Reed v. Farley*, 512 U.S. 339, 348 (1994) (further citation omitted)). Such a defect is not implicated here. *Gall* in no way undermines the reasoning of the Eleventh Circuit in reversing Grant's original sentence.   Grant's sentence was reversed, not because the Eleventh Circuit found it to be <u>substantively</u> unreasonable, but because the district court <u>procedurally erred</u> in calculating the amount of loss under the guidelines. *See Grant I*, 211 Fed. App'x at 897-98.  The Eleventh Circuit found that "the district court failed to provide any factual basis whatsoever for its ultimate loss calculation of $50,000." *Id.*   Post-*Booker*, a district court must still "begin all sentencing proceedings by correctly calculating the applicable Guideline range." *Gall*, 552 U.S. at 51; *see also, e.g., United States v. Medina*, 485 F.3d 1291, 1303 (11th Cir. 2007) (recognizing that, after *Booker*, "the district court must still correctly calculate the sentencing range prescribed by the guidelines") (citing *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005)).   And, in the context of calculating the Guidelines, a determination as to any loss amount is reviewed for "clear error." *E.g., Medina*, 485 F.3d at 1303 ("A district court's determination regarding the amount of loss for sentencing purposes is reviewed for clear error.")

12

(quotation marks and citations omitted). The Eleventh Circuit has continued to apply the clearly erroneous standard of review to loss determinations after *Gall*. *See United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011) ("The district court's determination of loss is reviewed for clear error." (citing *United States v. Bonilla*, 579 F.3d 1233, 1239 (11th Cir. 2009)); *United States v. Manoocher Nosrati–Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001) (per curiam)).

Moreover, even assuming that a loss calculation falls under the umbrella of "procedural reasonableness" and thus is reviewed under an abuse-of-discretion standard, the result is the same. This is so because "'[a] district court abuses its discretion if it . . . makes findings of fact that are clearly erroneous.'" *United States v. Ellisor*, 522 F.3d 1255, 1273, n. 25 (11th Cir. 2008) (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004)). Here, the Eleventh Circuit found that, in relation to Grant's original sentence, "the district court clearly erred in calculating the amount of loss attributable to Grant's false statements" because the trial judge provided no factual basis for his conclusion. *Grant I*, 211 Fed. App'x at 898. The court also noted that, in a previous case – one "strikingly on point with the facts of Grant's case" – the district court's calculation of loss was similarly arbitrary and thus "'an abuse of discretion and contrary to law." *Id.* (citing *United States v. Renick*, 273 F.3d 1009, 1027 (11th Cir. 2001) (per curiam)). In other words, whether

13

reviewed for "clear error" or an "abuse of discretion," Grant's original sentence was properly reversed.  Contrary to Grant's claim, there was no "intervening change of law" that, if applied to his case, would make a difference in the outcome. The reason his sentence was reversed – the trial judge's failure at sentencing "to provide any factual basis whatsoever for its ultimate loss calculation" – was unaffected by *Gall*. This claim is due to be denied.

### B.    Grounds Two through Seven - Ineffective Assistance of Counsel

### 1.    Sixth Amendment Standards

Each of Grant's other issues, which comprise "Ground Two" through "Ground Seven" of his motion, are based on claims that his attorneys provided constitutionally ineffective assistance, both at trial and on appeal.  The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defence."  U.S. Const. amend VI.  "It has long been recognized that the right to counsel is the right to effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970); *see also Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980).  A claim of ineffective assistance of counsel can be established upon a showing that the (1) "counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense" because the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

14

In a habeas corpus action, the petitioner generally carries the burden to establish both components. *Lawhorn v. Allen*, 519 F.3d 1272, 1293 (11th Cir. 2008) (citing *Atkins v. Singletary*, 965 F.2d 952, 958-59 (11th Cir.1992)).

The Eleventh Circuit has explained:

> To establish a constitutionally deficient performance, the defendant must "identify the acts or omissions ... that are alleged not to have been the result of reasonable professional judgment" to "show that counsel's representation fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 687, 690. The "highly deferential" reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and recognize that cases warranting the grant of habeas relief based on an ineffective assistance claim "are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quotation and citation omitted). ... "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689. ... Because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight," *Bell v. Cone*, 535 U.S. 685, 702 (2002), we must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

*Lawhorn*, 519 F.3d at 1293-94.

Once constitutionally deficient performance is established, the petitioner generally must also prove prejudice. To do so, the petitioner must convince the court "that there is a reasonable probability that, but for the counsel's unprofessional errors,

the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  While a petitioner need not show that counsel's deficient conduct "more likely than not altered the outcome of the case," it is not enough for the petitioner to show that counsel's errors merely had "some conceivable effect on the outcome of the proceeding." *Id.*, 466 U.S. at 693.  A court may decline to reach the performance prong if convinced that the prejudice prong cannot be satisfied in any event.  *Boyd v. Allen*, 592 F.3d 1274, 1293 (11th Cir. 2010).  Likewise, a court may dispense with analysis of the performance prong if it determines that the prejudice prong cannot be satisfied.  *See Strickland*, 466 U.S. at 697; *Rose v. McNeil*, 634 F.3d 1224, 1242 (11th Cir. 2011).

### 2.    Ground Two - Failing to Argue "Abuse of Discretion" Standard in the Eleventh Circuit

In his first ineffective-assistance claim, Grant complains that his counsel should have argued on his first direct appeal that an "abuse of discretion" standard, rather than a "clearly erroneous" standard, applied to the Eleventh Circuit's review of the district court's determination as to the amount of the loss for sentencing purposes.  As this claim is based on the same theory underlying as Grant's one substantive claim, that the Eleventh Circuit applied the wrong standard of review in

connection with the district court's sentencing finding as to the amount of the loss, it is due to be denied for essentially the same reasons.  As previously explained, the Supreme Court's decision in *Gall* does not undercut the validity of the Eleventh Circuit's analysis of the district court's loss amount finding in Grant's case. Accordingly, the failure of Grant's counsel to raise the standard-of- review argument was not deficient performance nor did it result in prejudice.  This claim is due to be denied.

### 3.   Ground Three - Failing to "Properly Argue that the Loss Determination had been Correctly Calculated"

In his third ground for relief, Grant contends that appellate counsel was ineffective for failing to "properly" argue that the initial loss calculation was correct. More specifically, Grant recognizes that it is the government's burden at sentencing to establish the amount of the loss to the judge's satisfaction, by a preponderance of the evidence.  *See United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011). He seems to contend that his attorneys should have argued on appeal that the government failed to satisfy that burden (*see* Dft. Memo at 12-15) and that, as a result, he "is entitled to have his sentence corrected to reflect the initial judgment [requiring him to serve only 5 months rather than the 24 months imposed upon remand] ... [or] an evidentiary hearing is required in this matter."  (*Id.* at 15).

Grant's original sentence was not reversed because the loss amount found by the district court was "incorrect." Rather, the Court of Appeals vacated the sentence because the loss amount was "unexplained" – *i.e.*, "the district court failed to provide any factual basis whatsoever for its ultimate loss calculation of $50,000." *Grant I*, 211 Fed. App'x at 898.  The court stated:

> In this case, the district court first concluded that the government had failed to show a loss of $484,000 by the preponderance of the evidence. In the wake of that determination, the court proceeded to reject both the government's recommended loss amount ($484,000) and the defendant's recommended loss amount ($20,000), as well as the loss that had been found, beyond a reasonable doubt, by the jury at trial ($350,000). Rather than adopting any of these figures, the court settled, somewhat inexplicably, on the total loss amount of $50,000. Not only was the record devoid of any such basis for arriving at that figure as the loss, but the court failed to state any "findings establishing the factual basis for its Guidelines calculation." [*United States v.*] *Hamaker*, [455 F.3d 1316, 1338 (11th Cir. 2006)]. Moreover, in a burst of candor, the court stated its recognition that the $50,000 figure "may sound arbitrary." R9 at 18. In similar cases involving unexplained loss calculations by the sentencing judge, we have seen fit to vacate the sentence and remand the case for re-sentencing. *See, e.g., United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001) (vacating a district court's sentence and remanding for re-sentencing, since the court "fail[ed] to make sufficient factual findings regarding the amount of loss" under the Guidelines). We do so here.

*Grant I*, 211 Fed. App'x at 897.  Counsel cannot be deemed deficient (nor can any prejudice be shown) regarding an alleged failure to "properly" argued that the initial loss amount was correct when the accuracy of the amount itself was not the issue

resulting in reversal.   Rather, the issue resulting in reversal was the original sentencing judge's <u>failure to explain its basis</u> for arriving at $50,000, an amount even he characterized as "sound[ing] arbitrary."   Grant provides nothing counsel could have presented that would have altered the appellate court's finding on that point.

Furthermore, to the extent that Grant is suggesting that he is entitled to relief on the theory that his counsel might have successfully argued that the district lacked sufficient evidence before it to make any loss amount determination, that argument is likewise without merit.   The Eleventh Circuit has explained:

> The district court is permitted to base its loss determination on factual findings derived from, "among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).   The district court may "consider [all] relevant information without regard to its admissibility ... at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see also United States v. Baker*, 432 F.3d 1189, 1254 n. 68 (11th Cir. 2005).   And it is not required that the district court constrain itself to absolute figures; instead, the court may rely on "specific circumstantial evidence" to estimate the amount of loss. *United States v. Willis*, 560 F.3d 1246, 1251 (11th Cir. 2009).

*Bradley*, 644 F.3d at 1290.

On remand, the undersigned, at Grant's counsel's request, precluded the government from presenting at the resentencing hearing additional evidence in connection with the amount of the loss. (Sent. Trans. II at 5, 23).   The undersigned

then proceeded to make a loss amount determination consistent with the jury's finding of $350,000, on the ground that it was supported by sufficient evidence in the existing record. (*Id.* at 23-26). That amount-of-loss determination was subsequently affirmed by the Eleventh Circuit on return to remand. *See Grant II*, 311 Fed. App'x at 190. Accordingly, any argument that there was insufficient evidence to establish the amount of the loss at the time of re-sentencing was necessarily invalid, insofar as the undersigned's finding on resentencing after remand was based on the very same evidence that was before the district court at the initial sentencing, and that finding was affirmed on appeal. Grant is not entitled to relief on this ground.

### 4.    Ground Four - Failure to Discuss a Government Cross-Appeal

Grant next contends that his counsel was ineffective for failing "To Inform [Grant] That The Government Could Cross-Appeal His Sentence If He Appealed His Conviction." (Dft. Memo. at 15). Grant complains that "counsel never informed [him] that there was a good possibility that the government would cross-appeal his sentence if he appealed his convictions." (*Id.*) He says that, had he "been made aware of this risk, he would have never agreed to let counsel file a notice of appeal." (*Id.*).

Counsel is generally required to consult with his client about taking an appeal, including a discussion "about the advantages and disadvantages of taken an appeal,

and making a reasonable effort to discover the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000).  It is assumed that, as Grant alleges, his counsel did not discuss with him specific "disadvantage" of whether an appeal by him might allow, or increase the likelihood of, a cross-appeal of his sentence by the government. However, Grant now correctly concedes that the government was entitled to appeal his sentence regardless of whether he himself appealed.  (*See* Dft. Reply at 8).  Under 18 U.S.C. § 3742(b), the government "may file a notice of appeal in the district court for review of an otherwise final sentence" if certain conditions are met. For example, the government may appeal if "the sentence was imposed in violation of law" or "was imposed as a result of an incorrect application of the sentencing guidelines . . . ." 18 U.S.C. § 3742(b)(1) and (2).  Nothing in the statute restricts the government's right to appeal to those instances where a defendant appeals first.  *See, e.g., United States v. McVay*, 447 F.3d 1348 (11th Cir. 2006); *United States v. Chavarria-Herrara*, 15 F.3d 1033 (11th Cir. 1994) (both involving government appeals of a sentence where there was no appeal by the defendant).  Further, there is no allegation or other evidence that the government ever suggested to Grant or his counsel that the decision on whether the government would appeal was conditioned upon or otherwise linked to whether Grant appealed.  As such, it is highly doubtful that the failure of Grant's counsel to specifically consult with Grant about the chances of the government

appealing the sentence if Grant appealed actually rises to the level of constitutionally deficient performance, even if such a discussion might have been prudent.

Even assuming *arguendo* that counsel's performance was deficient, however, Grant is not entitled to relief or a hearing because his allegations fail to show prejudice. Grant argues that while the government states in its brief that its "appeal of Grant's initial sentence was not a result of his decision to appeal his convictions" (Gov't Brief at 14), there is "no proof (or statement under oath)" to support that the government would have pursued an appeal even absent Grant's own. (Dft. Reply at 8). "As such," Grant contends, "the government's argument here is without substance," and his contrary assertions must be credited, entitling him to relief or at least an evidentiary hearing. Grant is wrong. Before a § 2255 movant is entitled to an evidentiary hearing, the burden is on the <u>movant</u> to plead specific facts in support of his ineffective-assistance claim, including prejudice, that, if true, would entitle him to relief. *See Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991); *see also* Rule 2(b)(2), Rules Governing § 2255 Proceedings (providing that a § 2255 movant must "state the facts supporting each ground of relief" asserted); *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005) (recognizing that habeas petitioners must "plead with particularity" and that "notice pleading is not sufficient"). Even if Grant would not have appealed, as he claims, that is not enough to establish prejudice because the

22

government could have still appealed, and, indeed, asserts that it would have done so. Rather, <u>Grant</u> must plead facts supporting that the government would have foregone its right to appeal if he did likewise.  On that front, he asserts that "without question, had counsel not filed a notice of appeal, the government would not have cross-appealed." (Dft. Memo at 16).  In support, however, Grant's cites only to the date of the government's notice of appeal, emphasizing that it was filed "some twenty (20) days *after* [his] notice of appeal." (*Id.*) (emphasis in original).  The fact that the government's notice was filed after Grant's does not even indicate (much less establish) that the government's decision to appeal the sentence was driven by Grant's decision to appeal his convictions.  Although a criminal defendant has only ten days to file a notice of appeal, the government, by rule, has thirty days.  Rule 4(b)(1)(B), Fed. R. App. P. ("When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of: (I) the entry of the judgment or order being appealed; or (ii) the filing of a notice of appeal by any defendant.").  Accordingly, the government's notice of appeal was timely without regard to the filing of Grant's appeal.  In addition, an appeal by the government had a substantial likelihood of success considering the district court's lack of an explanation on the record for the $50,000 amount-of-loss finding and the court's express acknowledgment that the figure might appear "arbitrary."  The government's

appeal was also materially successful, insofar as Grant's initial prison sentence of five months was increased to twenty-four months.  Given the lack of any facts indicating that the government would not have appealed, Grant has not shown prejudice.  Thus, his claim is due to be denied without a hearing.  *See Gallo-Vasquez v. United States*, 402 F.3d 793, 799-800 (7th Cir. 2005) (holding that district court properly denied § 2255 relief without a hearing on a claim that counsel was ineffective for failing to advise the defendant that the prosecutor had supposedly stated that the government would not appeal if the defendant did not, where there was no indication that such a statement had actually been made or that the government's cross-appeal was, in fact, made contingent on whether the defendant appealed).

### 5. Ground Five - Failure  "To Interview, Investigate, And Present Evidence In Support Of Petitioner's Defense."

In Ground Five of his motion, Grant asserts that counsel was ineffective for failing to investigate and present evidence that, he says, would have resulted in an acquittal.  (Dft. Memo. at 17-20).  To support the claim, he points to two areas of investigation that, according to him, would have established "there was absolutely no reason for [him] to submit false reports in an attempt to secure the loan from Covenant [Bank.]"  (*Id.* at 18).  First, Grant states that he "informed his attorney on several different times that he had no reason to try to defraud the Covenant Bank into

24

increasing his line of credit, simply because several other banks had already agreed to loan him the $1,000,000.00 line of credit needed if SPC secured the government contract." (*Id.* at 18).  Second, he asserts that he "made his attorney aware that he had already secured a Performance and Payment Bond for the $50 million dollar contract" and, based on this fact, he did not need an increase in his line of credit.  (*Id.* at 19).

To prove that counsel performed deficiently within the meaning of *Strickland*, Grant must establish more than just that counsel did not do everything possible. Rather, he must establish that counsel was acting "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). Instead, the only question is "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*  And, in the considering the issue, one applies a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

Grant cannot establish deficient performance.  Essentially, he is attempting to do so by criticizing counsel's failure to present evidence of little to no relevance. As Grant's petition itself makes clear, any claims of other credit lines and performance

bonds were dependent upon his company actually being granted the $50 million government contract. (Dft. Memo at 18 (stating that "several other banks had already agreed to loan him the $1,000,000.00 line of credit needed <u>if</u> SPC secured the government contract") (emphasis added). It is undisputed, however, that SPC was never awarded the contract at issue. Potential future lines of credit that were contingent on a not-yet-awarded contract had no relevance to SPC's undisputed efforts to raise its line of credit through Covenant Bank. Rather, the evidence showed that, at the time of the false reports, SPC "was having short-term financial difficulties; the record suggests that its $500,000 line of credit was almost fully exhausted . . . ." *Grant I*, 211 Fed. App'x at 891. Indeed, in another section of his brief, Grant himself recognized that he had told Ashley Page, Covenant Bank's loan officer assigned to SPC, that "he might have to shut down SPC if he did not obtain an increased line of credit." (Dft. Brief at 20-21). The evidence that Grant says his attorneys should have pursued and presented, that he had offers of future lines of additional credit if he secured the government contract, had little to no bearing on whether Grant had a motive to make the false statements to Covenant Bank, at a time when SPC had no such contract and was in a precarious financial position.

For similar reasons, Grant cannot establish prejudice in relation to this claim. To establish prejudice, "[i]t is not enough for [a petitioner] to show that the error had

some conceivable effect on the outcome of the proceeding." *Tompkins v. Moore*, 193

F.3d 1327, 1336 (11th Cir. 1999). Rather, Grant must establish "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694.  To be more specific in

relation to this claim, Grant must show "a reasonable probability" that, had counsel

presented evidence of credit which would accompany the awarding of a multimillion

contract, the jury would have acquitted. He can make no such showing.

Even assuming counsel should have presented such evidence, based on this

record, there is no reasonable probability of a different outcome.  As the Eleventh

Circuit noted, "there was a significant amount of evidence" establishing that Grant

was aware of the false statements, *see Grant I*, 211 Fed. App'x at 893  n. 8, which

would not be undermined by expectations of potential future lines of credit.  Some

of that evidence was as follows:

> The evidence at trial included the testimony of Hayes Parnell, the
> president of Covenant Bank, who testified that false statements were
> submitted to the bank during the time Southern Pride was seeking a
> credit line increase, and that when Parnell confronted Grant about it he
> did not deny that the statements were false. The government also
> presented the damaging testimony of comptroller Crisp, who testified
> that Grant instructed him to show accounts receivables of approximately
> $1 million, that Grant reviewed each of the false statements before they
> were submitted to the bank, and that Grant assured Crisp not to worry
> about the fact that the numbers were plainly false. Further testimony
> included that of Edwin Markham, a project manager with Southern

> Pride, who testified that the statements were prepared with numbers obtained directly from Grant, and Shannon Roberts, an office manager at Southern Pride, who testified that Grant reviewed the false reports, instructed her to fax them to the bank, and assured her that, once the company procured the Anniston contract, the false statements would no longer be necessary.

*Id.* Based on the evidence, there is no reasonable probability that the jury would have reached a different conclusion if presented with evidence that SPC had additional credit lined up if it was awarded a multimillion dollar contract. Proof that a defendant bought a lottery ticket before he robbed a bank does not go far toward showing that he would have had no motive to commit the robbery because the ticket might have paid off. Grant can show neither deficient performance nor prejudice, and this claim is due to be denied.

### 6.   Ground Six - Failing to "Argue and Request a Third-Party Guilt Jury Instruction"

Grant next asserts that he "was denied his Sixth Amendment right to effective assistance of counsel, due to counsel's failure to argue and request a third-party guilt jury instruction." (Dft. Memo at 20). Underlying the contention is Grant's assertion that he "repeatedly told his attorney that Mike Crisp had acted in conjunction with Ashley Page of the Covenant Bank in preparing and submitting the false reports . . . ." (*Id.*) This claim is legally unsound and is due to be denied.

It is not entirely clear what Grant means when he asserts that his attorneys

should have sought a "third-party guilt jury instruction."  Grant seems to suggest that he was entitled to a jury instruction (and by implication could have been acquitted) based on his theory that Ashley Page, Covenant Bank's loan officer, was aware of the fraudulent nature of the accounts receivable reports.  That claim is without merit. Counsel was not ineffective for failing to request an instruction on that theory, whatever name the instruction is given.  Even assuming that Page was aware of the false nature of the information would not absolve Grant of criminal liability; that knowledge would not change the fact that <u>Grant</u> knowingly presented the bank with false information.  *See United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996) ("Officers, directors, or other employees of a financial institution cannot validate a fraud on the institution. Therefore, the knowledge of bank fraud by officers, directors, or other employees of the institution is not a defense to the charge of bank fraud."); *United States v. Hamaker*, 455 F.3d 1316, 1326 (11th Cir. 2006) ("The agent of a financial institution is never empowered to authorize a fraud on the institution.") (citing *United States v. Gregory*, 730 F.2d 692, 701 (11th Cir. 1984) (stating that a bank's board of directors "cannot validate a fraud on the bank") (other citations omitted). SPC's credit agreement with Covenant required that SPC provide regular financial reports to demonstrate that its accounts receivable were consistent with the terms of the agreement – *i.e.*, that the amount of credit extended did not exceed 80%

29

of the accounts receivable.  The reports Grant filed in that regard were indisputably false. It is Grant's knowledge of the false nature of the reports that is significant, not Page's.

Additionally, Page was not the only authority figure in the bank to review the reports. According to the President of Covenant Bank, the reports in question "on a loan that size" are "always submitted to the board of directors . . . ."  (Trial Trans. at 44).  The Court of Appeals, moreover, held that Grant's conviction was warranted, even assuming Page was aware of the false reports and that he was the only bank employee who knew of their existence:

> We have made clear that an offense is complete under 18 U.S.C. § 1014 when it is established that (1) the defendant made a false statement or report; and (2) that he did so for the purpose of influencing the conduct of a federally-insured bank with respect to an application, advance, commitment, or loan. *United States v. Thorn*, 17 F.3d 325, 327 (11th Cir. 1994) (citation and internal quotations omitted).  Contrary to Grant's contention, we have never required that the bank be actually aware of the false statement that was made.  In fact, in *United States v. Lentz*, our predecessor circuit rejected the suggestion that the government was obligated to show that the false statements were "direct[ly] present[ed]" to the bank; it was enough, we held, to show that the defendant had "a reasonable expectation that the statement would reach [the bank]." 524 F.2d 69, 70-71 (5th Cir. 1975). Nor have our cases required a showing that the bank actually be deceived by the false statements when they are made.  *United States v. Johnson*, 585 F.2d 119, 125 (5th Cir. 1978).   Rather, we have made clear that the focus under 18 U.S.C. § 1014 is "on the defendant's intent rather than the victim." *Id.* at 124.  We focus on the defendant's conduct-not whether the bank was aware or unaware of that conduct.

In Grant's case, it is undisputed that the reports that were submitted to the bank were false.  Nor does Grant actually dispute that the false statements were intended to influence the bank.  Rather, his appeal hinges on an additional "bank awareness" requirement to 18 U.S.C. § 1014, one for which our case law provides no precedent.  There was ample evidence presented from which a jury could conclude, beyond a reasonable doubt, that Grant (1) made a false statement and that (2) he did so with the purpose of influencing Covenant Bank's conduct on the line of credit.  Accordingly, Grant's motion for acquittal was properly denied.

*Grant I*, 211 Fed. App'x at 892-93.  For the foregoing reasons, counsel was not ineffective for failing to request a "third-party guilt instruction."  Grant has established neither deficient performance nor prejudice in relation to this claim.  Therefore, it is due to be denied.

### 7.   Ground Seven - Failing "To Allow Petitioner To Submit Post-Trial Evidence Of His Actual Innocence"

Grant's final claim is that William E. Bright and John H. Wiley, III, the two attorneys he retained to pursue his first direct appeal, and Michael Hanle, the attorney Grant retained to pursue his direct appeal following his re-sentencing, were all ineffective for failing to present evidence of actual innocence that came to light after his conviction.  Specifically, Grant claims that two government witnesses, Shannon Roberts and Mike Crisp, told him that they would recant their trial testimony.  (Dft. Memo at 22-26).   In support of this claim, Grant relies solely upon his own

31

declaration,[8] which is attached as Exhibit 1 to his Memorandum of Law.  (*See* Civ.

Doc. 1 at 37-41 of 71 ("Dft. Decl."), ¶¶ 6-7).  Grant alleges therein that, shortly after

the trial, Roberts telephoned him crying and told him that she had "lied on the stand"

and "agreed to back up Crisp's allegations against [Grant]" because federal agents

had threatened her with prosecution and the loss of her children if she did not support

the government's charge that Grant "was guilty of falsifying documents to Covenant

Bank."  (Dft. Decl. ¶ 6).  Grant asserts that Crisp telephoned him shortly thereafter

and "admitted that he had lied against [Grant] on the stand."  (*Id.*)  Grant further

states that Crisp admitted that "Ashley Page from the Covenant Bank had not only

known about the false reports but encouraged [Crisp] to prepare and submit them to

the bank to keep [SPC] from going out of business, to keep Covenant Bank from

losing any money if [SPC] went out of business, and to keep Page from losing his job

at the bank if that happened."  (*Id.*)  Finally, Grant maintains that Crisp admitted that

---

[8]Grant has styled the document as an "Affidavit."  However, the document is unsworn, as the government emphasizes several times.  (Gov't Brief at 22-23).  Thus, the document is not valid as an "affidavit."  *See Delano v. Mastec, Inc.*, 2011 WL 1557863, *1 (M.D. Fla. 2011).  However, Grant declares in the document's introduction that he makes the statements therein "under penalty of perjury, pursuant to 28 U.S.C. § 1746," and that they are "true and correct to the best of [his] ability, understanding, and belief."  (Dft. Decl. at p. 1).  That statement is in substantial compliance with 28 U.S.C. § 1746 and is sufficient to render the unsworn declaration admissible in these proceedings to the same extent as a sworn affidavit or similarly verified statement would be.  *See* 28 U.S.C. § 1746; *United States v. Roberts*, 308 F.3d 1147, 1154 (11th Cir. 2002); *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1444 n. 36 (11th Cir. 1991); *Dickinson v. Wainwright*, 626 F.2d 1184, 1185 (5th Cir. 1980).

he "had prepared the reports without [Grant's] knowledge because he thought he was helping [Grant] and Page." (*Id.*)  Grant claims that he later met with Crisp and attorney Bright.  (*Id.*)  At that meeting at the offices of Grant's lawyers, Crisp allegedly repeated his admissions to Bright, along with his desire to go "in front of Judge Propst and try to straighten this mess out." (*Id.*)  According to Grant, however, Bright allegedly advised Crisp against doing so, warning him that "Judge Propst would give him '25 years' for lying on the stand," and Bright further stated that he "strongly believed that [Grant's] appeal would be successful and ..., thus, there would be no need for [Crisp] to admit that he had lied on the stand." (*Id.*)  As a result, Grant claims, Crisp decided not to make his admissions before the district court.  (*Id.*)

Grant also makes similar allegations against Michael Hanle, the attorney who appeared on his behalf to pursue his direct appeal after his re-sentencing.  (*See* Crim. Doc. 73).  Grant alleges that, after his sentence was reversed on the government's cross-appeal, he told Hanle "about the facts surrounding [Roberts's and Crisp's] admissions, along with the advice given by Mr. Bright, and asked him if there was anything that could be done about it." (*Id.* ¶ 7).  Grant claims that Hanle responded by telling Grant "that it was no use trying[,] because Judge Propst would just say that I had paid [Roberts and Crisp] to make those admissions." (*Id.*)

Grant appears to argue that Bright, Wiley, and then later Hanle were ineffective

because they failed to use the alleged recantations of Roberts and Crisp to seek a new trial. Rule 33(b)(1) of the *Federal Rules of Criminal Procedure* authorizes a motion for a new trial grounded upon newly discovered evidence provided the motion is filed within three years of the verdict. Such a motion may be based upon a recantation of a government witness. *See United States v. Cross*, 928 F.2d 1030, 1053 (11th Cir. 1991); *United States v. Lee*, 68 F.3d 1267, 1273-74 (11th Cir. 1995); *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995); *see also* 3 Wright & Miller, Fed. Prac. & Proc. Crim. § 585 (4th ed. 2011 update) ("Often a defendant will seek a new trial on the ground that a material witness for the prosecution has recanted and now admits that his testimony at the trial was false. Although this is not newly discovered evidence in a true sense, but only an assertion that the old testimony was false, if it is not merely impeaching but substantial and material, courts will consider it."). Because the recanted-testimony issue arose well within three years of the verdict, a new trial motion could have been filed within the time prescribed by Rule 33.[9] Also,

---

[9]In his declaration, Grant states that he received the phone calls from Roberts and Bright "within thirty (30) days following the verdict." (Dft. Decl. ¶ 6). The jury returned the verdict on January 6, 2005, which would mean that the calls would have occurred sometime before early February 2005. However, an e-mail that Grant attached to his Reply Brief (*see* Doc. 6 at 13-14) indicates that the calls occurred somewhat later. Specifically, Grant wrote in that e-mail dated May 22, 2005, directed to attorney Wiley, that the call from Crisp occurred on May 1, 2005, and that the meeting at the law office occurred the following day. Grant has likewise asserted that the calls occurred while he was represented by Wiley and Bright, who handled the initial direct appeal. Neither attorney appeared in the case until after Grant was sentenced in late April 2005. (*See* Crim. Doc. 23; Unnumbered minute entry dated 5/20/2005). Ultimately, however, whether

Grant did have a Sixth Amendment right to counsel at that stage of the proceedings, as he was still pursuing his direct appeals.  *See United States v. Berger*, 375 F.3d 1223, 1226 (11th Cir. 2004) (per curiam).  Accordingly, it would appear that Grant can at least overcome such procedural obstacles on these claims.

However, even assuming that the relevant circumstances are as Grant claims,[10] he cannot establish at least *Strickland*'s prejudice prong.  In order to show prejudice, Grant must show, at a minimum, that there is at least a reasonable probability that the

_____

Grant's alleged conversations with Roberts and Crisp occurred in about January or February 2005 as opposed to late April or early May 2005 is of no consequence to these ineffective-assistance claims.  Either way, there would clearly have been time to file a new trial motion within three years of the verdict.

[10]The government has submitted an affidavit from attorney Wiley that disputes many of Grant's allegations with regard to Crisp's alleged recantation.  (*See* Civ. Doc. 4-2 ("Wiley Aff.")).  Wiley corroborates some of Grant's story, acknowledging that "some time while [Grant's initial] appeal was pending," Grant came to "Mr. Bright and [him, i.e., Wiley] and said that ... Shannon Roberts and Mike Crisp ... had contacted him [i.e., Grant] and apologized for testifying untruthfully."  (Wiley Aff. at 1).  Wiley also confirms that Crisp came to his and Bright's law office to discuss the matter some time later.  (*Id.*)  Wiley contends, however, that Crisp never said at that meeting that Grant did not know that the reports submitted to the bank were false, which is what Wiley suggests he thought Crisp might admit.  (*Id.* at 1).  Rather, the "entire thrust" of Crisp's discussion at the meeting, according to Wiley, was merely that Ashley Page, the bank's loan officer, knew that the reports were false when he accepted them for the bank.  (*Id.* at 2).  Wiley asserts that they all discussed that such information was not useful to Grant's case insofar as Page himself had already testified to as much at trial.  (Wiley Aff. at 2).  Wiley says that he and Bright then suggested to Crisp that it was a serious matter to lie under oath in a court proceeding and that he should consult his attorney before he went about claiming that he had done so, if that was what he intended to do.  (*Id.*)  That was the last that Wiley says he heard about Crisp or the issue of perjured testimony.  (*Id.*)  Grant responded to Wiley's affidavit by asserting in his reply brief that Wiley is lying insofar he was not even present at the meeting with Crisp and Bright.  Although that assertion is neither sworn nor made in a declaration complying with 28 U.S.C. § 1746, Grant's earlier declaration, which does substantially comply with § 1746, suggests that only he, Crisp, and Bright were present for the subject meeting at the law office.

35

district court would have granted a new trial motion based on the alleged recantations had such a motion been filed. *See United States v. Gibbs*, 662 F.2d 728, 731 (11th Cir. 1981) ("The failure of counsel to move for a new trial because of perjured testimony and because of the existence of new evidence, reasons advanced by Gibbs, did not indicate ineffectiveness and could not have been prejudicial since the [district] court would not have granted a new trial on those grounds."); *see also Butcher v. United States*, 368 F.3d 1290, 1294-95 (11th Cir. 2004) (holding that to show prejudice on ineffective-assistance claim, the defendant had show that the trial court would have granted a timely motion for a new trial and that the appellate court would have affirmed, given that the government would have appealed).

In criminal proceedings, "the trial is the paramount event for determining the guilt or innocence of the defendant." *Herrera v. Collins*, 506 U.S. 390, 416 (1993). "For newly discovered evidence to justify a new trial, the evidence must be material and not merely cumulative or impeaching, and must be such that it will probably produce an acquittal." *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999) (citing *United States v. Pope*, 132 F.3d 684, 688 (11th Cir. 1998)). Further, "recantations are viewed with extreme suspicion by the courts." *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009) (quoting *United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988)). Recanted testimony "upsets society's interest in the finality

36

of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Davis*, 565 F.3d at 825–26 (quoting *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting)); *see also Newman v. United States*, 238 F.2d 861, 862 (5th Cir. 1956) (noting that a new trial will not automatically be granted based on the affidavits of recanting co-conspirators because "frequently [the affiants] who, as participants, co-conspirators, or actors in the criminal activity initially charged, might from a variety of base motives, or importunities, be impelled, by recantation, to come to the aid of a person whose conviction has been brought about by their testimony"). New trial arguments based on affidavits are even more suspect where they consist only of hearsay. *See Herrera*, 506 U.S. at 417; *United States v. Jernigan*, 341 F.3d 1273, 1287-88 (11th Cir. 2003); *United States v. Scrushy*, 2012 WL 204159, *9 (M.D. Ala. 2012). "[A] failure to produce or explain the absence of an affidavit of a recanting witness will result in the denial of a motion for a new trial." *United States v. Ward*, 544 F.2d 975, 976 n. 2 (8th Cir. 1976). "[A] specific, sworn recantation is necessary to contradict sworn trial testimony that has been subject to cross examination." *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007); *see also United States v. Pearson*, 203 F.3d 1243, 1274-76 (10th Cir. 2000); *United States v. Magana*, 118 F.3d 1173, 1194-95 (7th Cir.

1997); *United States v. DiCarlo*, 575 F.2d 952, 961 (1st Cir. 1978); *cf. Davis*, 565 F.3d at 826 ("Because [the witnesses's] post-trial affidavit is unsworn, like the Supreme Court of Georgia, we are loath to consider it, and afford it precious little weight, if any.").

The only evidence indicating that Roberts and Crisp would have recanted any of their sworn trial testimony is Grant's declaration.  There is no statement, sworn or unsworn, from either Roberts or Crisp.  Grant's own statements regarding what Roberts and Crisp supposedly said to him are hearsay and clearly would not themselves be sufficient to carry the day on a motion for a new trial based on an alleged witness recantation. *See Haouari*; *Pearson*; *Ward*, *Scrushy*, *supra*.  Likewise, without proof from Roberts or Crisp themselves, Grant's claim of prejudice based on his logically derivative theory that his attorneys should have presented their testimony in a new trial motion is insufficiently substantiated.  *Cf. Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints of uncalled witnesses are not favored ... because allegations of what a witness would have testified to are largely speculative."); *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980) ("None of the alleged witnesses [that counsel failed to present] were called at the § 2255 hearing and no one knows what they would have testified to.  All we have is what Guerra says they would have said.").

Even beyond the lack of an affidavit from Roberts or Crisp, Grant's allegations do not support that there is a reasonable probability that a new trial motion would have been granted based on the alleged recantations.  With regard to Roberts, who was Crisp's secretary, Grant's declaration recites that she told him that she "had lied on the stand and agreed to back up Crisp's allegations against [Grant]." (Dft. Decl. ¶ 6).  However, Grant's declaration is otherwise vague about what Roberts allegedly said, as he fails to explain the particulars of any of Roberts's alleged "lies" or how her alleged recantation might have resulted in an acquittal.  With regard to Crisp's alleged recantation, Grant claims that Crisp acknowledged that Page had "not only known about the false reports [from SPC], but encouraged [Crisp] to prepare and submit them to the bank to keep [SPC] from going out of business, to keep Covenant Bank from losing any money if [SPC] went out of business, and to keep Page from losing his job at the bank if that happened."  (Dft. Decl. ¶ 6).  However, such allegations indicating that Page and Crisp were complicit in the fraud are not newly discovered evidence, as testimony to that effect was given at trial by Crisp himself.  Moreover, as discussed previously, even if Page was complicit, that would not constitute a defense to the charges against Grant.  The jury was also made aware of the fact that Crisp had pled guilty and would likely be receiving a reduced sentence for his testimony against Grant.  Such evidence was merely cumulative and potentially

impeaching and thus generally insufficient to warrant a new trial.  *See Diaz*, *supra*.

Grant further claims that Crisp admitted that he "had prepared the reports without [Grant's] knowledge because he thought he was helping me and Page." (Dft. Decl. ¶ 6).  Such an alleged recantation would be material.  Crisp's testimony was quite "damaging" to Grant, as the Eleventh Circuit noted. Grant I, 211 Fed. App'x at 893 n.8.  Crisp did the accounting and financial work for SPC, and it was he who compiled the false accounts receivables information and created and submitted the final reports containing it to the bank, all allegedly at Grant's direction.  Accordingly, he was the government witness with the most intimate inside knowledge of the false reports and of Grant's knowledge of the fraud.  However, there were other witnesses who corroborated Crisp's trial testimony that Grant was, in fact, aware of the falsity of the reports.  One is Roberts, as Grant's vague, hearsay assertion that she admitted to him that she "lied on the stand" barely qualifies as a recantation.  But even without her, there are at least two other witnesses whose testimony supports that Grant was aware of, if not instrumental in creating, the fraudulent accounts receivable reports.  First, Hayes Parnell, the president of the bank, testified that he confronted Grant about the reports and that Grant did not deny that the statements were false.  *See Grant I*, 211 Fed. App'x at 893 n. 8).  The jury could have interpreted Grant's silence in such circumstances as an adoptive admission that Grant knew the statements were

false.  *See United States v. Joshi*, 896 F.2d 1303, 1311 (11th Cir. 1990); Rule 801(d)(2)(B), FED. R. EVID.  The other witness was SPC Senior Project Manager Edwin Markham, who testified that the reports were not only obviously and significantly inflated, but also were based on outdated and patently erroneous customer contract information.  More to the point, Markham testified that he recalled an occasion where he heard Crisp specifically tell Grant "that the figures that [Grant] had asked [Crisp] to put down on the [accounts receivable] were incorrect..., [t]hey were not right," to which Grant allegedly replied, "Don't worry about it, it's my ass." (Trial Trans. at 158).  That testimony by Markham specifically corroborated Crisp's earlier trial testimony that he had just such an exchange with Grant over the reports. (*See id.* at 117-18).  When weighed against the substance of Grant's allegations in his declaration, their hearsay nature, and the suspicion with which courts generally view recantations, the other evidence against Grant that was presented at trial supports that Grant cannot show prejudice on these ineffective-assistance claims.  These claims are due to be denied.

## III.   CONCLUSION

Based on the foregoing, Grant's § 2255 motion to vacate is due to be **DENIED**, and this action is due to be **DISMISSED WITH PREJUDICE**.

A separate Order of Dismissal will be entered.

**DONE** this the 5th day of March, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge